**Wilson v. Warminster Township**

*Bernard F. Gray*, for appellants.
*Elliot M. Drexler*, contra.

MOUNTENAY, *J.*, January 30, 1976—This is a consolidated appeal from the suspension of two Warminster Township police officers pursuant to the provisions of the Act of June 15, 1951, P.L. 586, 53 P.S. §§811, et seq., which act regulates the suspension, removal, etc., of police officers in certain municipalities, including townships of the second

class. Warminster Township is a township of the second class.

One officer, Charles J. Wilson, Jr., was charged with a violation of section 2, subsection (2), of the said Act of 1951, as amended, 53 P.S. §812(2), relating to the neglect or violation of any official duty, as well as with a violation of article IV, section 4.18, of the Warminster Township Duty Manual Disciplinary Code, which section deals with neglect of equipment and vehicles. The other officer, Glen G. Bittle, was charged with a violation of section 2, subsection (4), of the Act of 1951, 53 P.S. §812(4), relating to conduct unbecoming an officer. Testimony was taken at a hearing held before the board of supervisors. Following said hearing, Wilson was suspended from duty for a period of three days, and Bittle was suspended for a period of six days.

This appeal followed, and the record was supplemented by the taking of additional evidence at the appeal hearing. The common pleas court may, on appeal, take additional testimony and find for itself the facts necessary to a just determination of the controversy: Vega Appeal, 383 Pa. 44, 117 A. 2d 736 (1955); Masemer v. Borough of McSherrystown, 34 D. & C. 2d 669 (1964); Mount Holly Springs Borough v. Stoerzinger, 12 Cumberland 2 (1961). It is the duty of the court to determine the case as it deems proper and to make its own order concerning the suspension, discharge, demotion or reinstatement of the officer in question: Vega Appeal, supra; Masemer v. Borough of McSherrystown, supra. Furthermore, in order to impose the severe penalty of suspension, proof of the charges must be clear and convincing: Soergel v. Board of Supervisors of Middlesex Township, 12 Pa. Commonwealth Ct. 311, 316 A. 2d 89 (1974); Masemer

v. Borough of McSherrystown, supra; Mount Holly Springs Borough v. Stoerzinger, supra.

Based upon the record below, as well as upon the additional testimony taken at the hearing before us, we make the following findings of fact with respect to Bittle:

1. On January 24, 1974, at approximately 11:30 p.m., Officers Bittle and Wilson, using separate patrol cars, were both dispatched by radio to the Bloo Kangaroo Bar to investigate a complaint relative to a disorderly bar patron.

2. Upon arrival at the bar, a Mr. Zepp, the person concerning whom the complaint was made, met the officers in the lobby and complained loudly and boisterously about having been "flagged." Zepp was escorted out the front door by the officers.

3. Immediately thereafter, a Mr. Beagle, apparently a friend of Zepp, exited the bar demanding to know why he, Beagle, had been flagged. Officer Bittle responded that to the best of his knowledge, Beagle had not been flagged and that he could remain at the bar if he desired. Beagle was not placated, began calling the officers obscene names, got into a "pushing-type fight" with Zepp, and was generally disorderly and obnoxious.

4. Beagle than pushed Officer Wilson, and when Wilson took Beagle's arm to restrain him, Beagle struck Wilson on the jaw. The officers attempted to subdue Beagle and place him under arrest, whereupon Zepp interfered. The officers thereupon used mace to subdue Beagle and Zepp. All during this time, Zepp was shouting to Beagle, "You're going to ruin my case against them."

5. After having been maced, Beagle ran blindly into the street and narrowly missed being struck by a SEPTA bus. After Beagle disregarded Bittle's order to halt on several occasions, Bittle shouted,

"Stop or I'll shoot!" Bittle thereupon fired one shot into the air. Beagle then slowed down and was apprehended.

6. In response to an "assist officer" call, other patrol cars arrived, and Beagle and Zepp were taken into custody. By this time, a crowd had gathered.

7. Both Beagle and Zepp were transported to police headquarters in the back seat of the patrol car operated by Bittle. Wilson followed alone in his police vehicle.

8. During the trip to the police station, both Zepp and Beagle shouted obscenities, including but not limited to, "I'm going to fuck and kill you," and "Wait until I get my hands on you." Beagle also spat upon Bittle through the screen separating the officer from the prisoners. This happened on numerous occasions during the trip to the police station.

9. Upon their arrival at police headquarters, Beagle complained that Bittle had referred to Beagle's wife as a "Spic bitch" during the trip to headquarters. This was corroborated by Zepp. However, neither Beagle nor Zepp testified either at the hearing before the board of supervisors or at the hearing on appeal.

10. At the time of the incident in question, there was no formulated policy regarding the discharge of firearms by way of a "warning shot."

11.. Subsequent to the incident in question, the police department adopted a policy permitting the firing of a warning shot, at the discretion of the officer.

12. Warning shots had been fired in other cases prior to the incident in question, but to the knowledge of the officers testifying, no disciplinary action had ever been taken with respect thereto.

As regards Officer Wilson, we adopt findings nos.

1 to 12 with respect to Bittle and make the following additional findings:

1. At the time of the incident at Bloo Kangaroo Bar, Officer Wilson, while he did not actually use mace, was exposed thereto. When he entered his vehicle to return to headquarters, the corners of his eyes were burning, but his vision was unimpaired.

2. As the vehicles operated by Bittle and Wilson, respectively, were traveling into the driveway of the police station, the vehicle operated by Wilson was following the other vehicle at a distance of from ten to 15 feet. Both vehicles were being operated at a speed of approximately five to ten miles per hour.

3. At this time, the prisoners in Bittle's vehicle caused a disturbance, whereupon Bittle suddenly stopped his vehicle. The following vehicle operated by Wilson then struck the Bittle vehicle in the rear causing "relatively minor" damages.[1] At the time of this collision, the condition of Wilson's eyes had worsened due to the mace, and he had already opened the windows of his vehicle and was also operating the air conditioner. It will be recalled that the event occurred in January.

## DISCUSSION

Addressing ourselves first to the six-day suspension imposed upon Officer Bittle, we note that the township charged Bittle with three counts of conduct unbecoming an officer, viz.: (1) Discharging a firearm to stop a fleeing arrestee; (2) referring to Beagle's wife as a "Spic bitch"; and (3) disparagingly addressing one of the bystanders at the Bloo

---

1. Damages to the vehicle operated by Wilson were estimated at $345 and the vehicle operated by Bittle at $178.

Kangaroo incident as a "Friend of Lorry Post's." From a colloquy between the court and counsel at the appeal hearing, it appears, however, that the township has abandoned the third charge.[2]

As to the warning shot, we note that there was no police policy regarding the discharge of firearms by way of a warning shot at the time of the incident. Even after the adoption of a formal policy, the use of a warning shot was left to the discretion of the individual officer. Warning shots had been fired in previous instances, and it appears that no disciplinary action had ever been taken with respect thereto. We do recognize that the absence of a formal policy is not controlling. For example, in Eppolito v. Bristol Borough, 19 Pa. Commonwealth Ct. 99, 339 A. 2d 653 (1975), the court upheld the suspension of an officer who had picked up a lost license plate and affixed it to his own vehicle despite the lack of a departmental policy on the subject. However, the impropriety of such conduct was self-evident completely apart from any statement of departmental policy or procedure. In the instant case, an immediate exercise of judgment was demanded, and we find no rash or irresponsible exercise of that judgment. This being the case, absent any departmental guidelines, we see no basis for disciplinary action.

2. At N.T. 36, we find the following:

"THE COURT: [I]nsofar as Bittle is concerned, we're talking about the alleged use of a racial slur and the discharge of a firearm? . . . [I]s there anything that I am missing?

"MR. DREXLER: No."

(We observe that Lorry Post was a local attorney. It would appear from the context of the remark that it was not necessarily to be regarded as a compliment. Nevertheless, how "accusing" one of being Lorry Post's friend can constitute a slur or insult such as would justify suspension escapes us.)

In addition, we note, parenthetically, that pursuant to section 508(a) of the Crimes Code of December 6, 1972, P.L. 1068, 18 Pa.C.S. §508(a), a peace officer is "justified" in using deadly force in effecting an arrest when he believes that the use of such force is necessary to prevent the arrest from being defeated by escape and that the person to be arrested has committed a forcible felony. At the time of the firing of the warning shot, Beagle had already struck Wilson in the face. Accordingly, Bittle was certainly warranted in believing that Beagle had attempted to cause bodily injury to a police officer making a lawful arrest. Under section 2702(a)(3) of the Crimes Code, Act of 1972, supra, 18 Pa.C.S. §2702(a)(3), such conduct constitutes a felony. Accordingly, the use of a deadly force may well have been in order or, at least, justified. Bittle's firing a revolver into the air fell far short of the use of deadly force.

Bittle testified at the hearing before the board of supervisors that the foregoing considerations motivated his firing the warning shot. While justifiable conduct under the Crimes Code is not necessarily the equivalent of conduct becoming an officer, nevertheless, these considerations do help to explain and tend to justify Bittle's position. Again, we are of the opinion that the firing of the warning shot provides no basis for suspension.

The second ground for suspension was the alleged utterance by Bittle of a racial slur. As stated in the findings of fact, both Zepp and Beagle complained of this remark at police headquarters on the day in question. However, neither testified either at the hearing before the board of supervisors nor at the hearing before the court. The only other circumstance tending to show that Bittle had made

any such remark was evidence with respect to a purported admission on the part of Bittle. At the hearing before the court, Chief Brennan testified as follows: "I *think* I asked in the case of Officer Bittle about the alleged remark about the Spic bitch and he told me he didn't recall saying bitch. He did recall *something* about Spic." (Emphasis supplied.)

When questioned about the conversation before the board of supervisors, Bittle said, "I don't recall exactly what I said. I was surprised when they brought that up. I even said that I don't recall saying that . . . I don't remember saying it. I don't know, I don't remember what we really—what's more, he was doing the talking and I didn't have much to say there.": Hearing before the board, page 87.

We are asked, then, to sustain an order of suspension on the basis of (1) hearsay, and (2) somewhat uncertain testimony relative to a somewhat equivocal statement made by Bittle. We realize that local agencies are not bound by the technical rules of evidence and that all relevant evidence of reasonable probative value may be received: Local Agency Law of December 2, 1968, P.L. 1133, sec. 5, 53 P.S. §11305. This has been construed as permitting the introduction of hearsay testimony, but an adjudication cannot be founded entirely on hearsay: McCarthy v. Philadelphia Civil Service Commission, 19 Pa. Commonwealth Ct. 383 (1975).

As regards the hearsay, completely apart from questions of competency, we are unwilling to accord any credibility to an unsworn accusation, uncorroborated and not subject to cross-examination, leveled at a police officer by two arrestees both of whom, as evidenced by other conduct, were obvi-

ously motivated by malice. As to the "admission," it is simply too equivocal to have any probative value. In our opinion, the evidence presented is not sufficient even to support a finding of fact; much less does it measure up to the clear and convincing proof required to impose the severe penalty of suspension: Soergel v. Board of Supervisors of Middlesex Township, supra.

The remaining ground asserted in support of Bittle's suspension, it will be recalled, was the charge that he had made reference to a bystander's friendship with Lorry Post on the occasion in question. As stated previously, we understand this ground to have been abandoned. In view of the failure of the first two grounds and the abandonment of the third ground, the suspension order as regarding Bittle must be vacated.

With respect to Officer Wilson, it is the township's contention that the manner in which he operated his police car was "careless and imprudent" in that he failed "to allow for an adequate and safe stopping distance." Article IV, section 4.18, of the Warminster Township Duty Manual Disciplinary Code provides that "Failure to properly care for assigned equipment and vehicles damaging same due to neglect or carelessness" constitutes a violation of the Warminster Township Duty Manual Disciplinary Code. We must first observe that although this was a rear-end collision, the mere happening of a rear-end collision does not necessarily constitute negligence on the part of the operator of the rear vehicle: Repinski v. Dellinger, 94 Dauph. 337 (1972), and the cases therein cited. It will also be recalled that Wilson was suffering to some extent by exposure to mace at the time of the accident. It also appears, that at the time of the incident there

was no departmental policy regarding the operation of vehicles after exposure to mace. In any event, it is apparent that Bittle had suddenly and unexpectedly applied his brakes due to the disorderliness of the prisoners in the back seat of his car. Whether or not Wilson's operation of his vehicle was negligent under these circumstances, we do not feel that his conduct was of such nature as to warrant a three-day suspension.

## ORDER

And now, January 30, 1976, the order of the Warminster Township Board of Supervisors suspending Officer Charles J. Wilson, Jr., for a period of three days and the order of the Warminster Township Board of Supervisors suspending Officer Glen G. Bittle for a period of six days are hereby vacated.